IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MCGRATH              :         CIVIL ACTION
                             :
        v.                   :
                             :
LUMBERMENS MERCHANDISING CORP. :       NO. 10-7513

MEMORANDUM

Dalzell, J.                              March 20, 2012

        Plaintiff Michael McGrath's complaint alleges that

defendant Lumbermens Merchandising Corporation (herein

"defendant," the "employer", or "LMC")[1] terminated him because of

his age in violation of the Age Discrimination in Employment Act,

29 U.S.C. § 621 et seq. ("ADEA") and the Pennsylvania Human

Relations Act, 43 P.S. § 951 et seq. ("PHRA").

        LMC filed a motion for summary judgment, to which

McGrath responded.  Defendant then filed a reply, and plaintiff

filed a sur-reply.  For the reasons set forth below, we will

grant LMC's motion for summary judgment.


I.    **Factual Background**[2]

_____

        [1] We will, at times, refer to actions by LMC's agents
as the actions of defendant alone.

        [2] For purposes of clarity, we will refer to the record
as follows: Defendant's Statement of Undisputed Facts ("Def.'s
Facts"), Plaintiff's Answer to Defendant's Undisputed Facts
("Pl.'s Answer"), Plaintiff's Statement of Disputed and
                                        (continued...)

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record."  Bello v. Romeo, 424 F. App'x 130, 133 (3d Cir. 2011).

We will thus begin by reciting the undisputed facts in this matter.  In so doing, we will keep in mind that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment," Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009), and we should not credit statements in affidavits that "amount[] to (i) legal argument, (ii) subjective views without any factual foundation, or (iii) unsupported assertions made in the absence of personal knowledge."  Reynolds v. Dep't of Army, 439 F. App'x 150, 152 (3d Cir. 2011).

The parties agree on the essential details of McGrath's employment history with LMC.  Defendant, headquartered in Wayne,

---

[2] (...continued)
Undisputed Facts ("Pl.'s Facts"), all other record evidence ("party, exhibit letter/number, page"), and, in the case of depositions ("Deponent's Name, Dep., page number:line).

Pennsylvania, is the largest forest products and building materials buying group in the United States.  LMC's 365 member-owners ("shareholders") are an exclusive network of independent lumberyard companies.  On July 31, 2000, when he was fifty-one, McGrath began his employment with LMC in the Wayne headquarters as a trader/buyer ("trader") in the Lumber Commodities Division in the Eastern Spruce Department (the "department").  McGrath worked for LMC for about seven-and-a-half years until he was terminated in a reduction-in-force ("RIF") on February 4, 2008.[3]

As a trader, McGrath was responsible for fielding calls from LMC's shareholders, advising them on the lumber products markets, and buying products and supplies for them.  McGrath reported directly to Jim Lefever, Department Manager for the Eastern Spruce Department.  Lefever reported to Fred Ashman, the Purchasing Manager until 2004 when John Raffetto assumed the Purchasing Manager role for the Western and Eastern Spruce Departments.  Plaintiff reported to the Purchasing Manager about once a month.

---

[3] It is undisputed, despite plaintiff's sometimes curious allusions to the contrary, that defendant's layoffs were, indeed, part of a RIF.  Def.'s Facts ¶ 4; Pl.'s Answer ¶ 4. Thus, there is no need for us to consider here whether defendant terminated plaintiff in the course of a RIF.

Since the start of McGrath's employment with LMC, management thought him to be a disruptive influence at work. In addition, management consistently noted that he was contentious, abrupt, and intimidating. Def.'s Facts ¶ 9; Pl.'s Answer ¶ 9. McGrath acknowledges that during the course of his employment with LMC, managers discussed with him his curt and abrupt manner with dealers and vendors. In fact, he does not disagree with this description of his performance. Def.'s Facts ¶ 10 (citing Pl.'s Dep. 44:6-45:12); Pl.'s Answer ¶ 10. These concerns were reiterated in subsequent years on his annual performance evaluations, including the 2006 and 2007 evaluations. Pl.'s Exs. 8-11 (Exs. 10 & 11 describe plaintiff as "judgmental" and "intimidating", and note a lack of "patien[ce] with staff, mills and dealers" but also observe that he was improving some in these areas). These written evaluations were shared with McGrath in evaluation meetings.

In every review, Raffetto discussed plaintiff's aggressiveness, rudeness, inappropriate manner, and quickness to judge -- including the 2007 review that was McGrath's last. Raffetto also had counseling sessions with plaintiff both inside and outside of the review process. Senior Management, including John Broomell, Senior Vice-President of Purchasing, and then-CEO

Anthony DeCarlo, were generally aware of McGrath's deficiencies. Nevertheless, in 2007 McGrath and a colleague received a 5% discretionary bonus while two others received a 3% bonus.  Pl.'s Facts ¶ 47.  In 2006, plaintiff was promoted to a Buyer 3 status because he was "one of the stronger, more experienced Traders [Brokers] in the Division."  Id. ¶ 48 (emphasis added).

In late 2006 and through 2007, LMC experienced a significant downturn in business as a result of the collapse of the real estate and construction industries.  McGrath admits that he observed a "big cutback" in production in 2006 that led to his department suffering "the most severe drop in business".  Def.'s Facts ¶¶ 29, 45; Pl.'s Answer ¶¶ 29, 45.  As a consequence, senior management held a meeting in January of 2008 to discuss LMC's finances and expenses.  DeCarlo instructed Broomell and Andrew Toombs (Vice-President for Purchasing) to decide what cuts were needed and report back to him.  Def.'s Facts ¶ 34; Pl.'s Answer ¶ 34.  McGrath specifically admits that Toombs approached Raffetto and they discussed the reduced volume in the department and agreed that it would be necessary to terminate employees. Toombs asked Raffetto to look at his staff and recommend employees for the RIF.

Raffetto recommended to senior management that McGrath be eliminated in a first wave of RIF layoffs because his deficiencies weighed in favor of dismissal even in light of his sales figures.  Specifically, it is uncontroverted that Raffetto based his decision to include McGrath in the RIF based on plaintiff's attitude and lack of seniority at the company.  Pl.'s Facts ¶ 40; Def.'s Answer ¶ 40.  DeCarlo approved the recommendation to terminate McGrath because the justifications given "seemed plausible."  Def.'s Facts ¶ 49; Pl.'s Answer ¶ 49. It is uncontested that DeCarlo did not know the ages of the individuals recommended for the RIF, and his deposition testimony reveals that neither Toombs nor Broomell informed him of McGrath's age.

On February 4, 2008, plaintiff and others were notified that they were being terminated.  McGrath was not surprised that LMC was forced to conduct a RIF.  Following his termination, plaintiff's duties were distributed among the remaining buyers. He was not replaced.  Def.'s Facts ¶ 68; Pl.'s Resp. Facts ¶ 68.

During February and March of 2008, eight employees were terminated as part of the RIF.  After the February/March RIF, LMC's sales numbers did not improve and LMC conducted a second RIF in October of that year.  At that time Raffetto recommended

that a thirty-five-year-old buyer from the department, Mark Thornton, be eliminated, along with eleven other employees.

## II.  <u>Analysis</u>

On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," <u>Adderly v. Ferrier</u>, 419 F. App'x 135, 136 (3d Cir. 2011) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." <u>Id.</u> "'A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law,'" <u>J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.</u>, 650 F.3d 915, 925 (3d Cir. 2011) (quoting <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992)).  A factual dispute is genuine "'if the [record] evidence [taken as a whole] is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." <u>Bialko v. Quaker Oats Co.</u>, 434 F. App'x 139, 141, n.4 (3d Cir. 2011) (quoting <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)) (bracketed

material in original).

　　　As already noted, we "draw all reasonable inferences in

favor of the nonmoving party, and [we] may not make credibility

determinations or weigh the evidence." Eisenberry v. Shaw Bros.,

421 F. App'x 240, 241 (3d Cir. 2011) (quotation marks omitted).

　　　Plaintiff's claims under the ADEA[4] and the PHRA[5] are

co-extensive and proceed under the burden-shifting framework

first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973).  See Gross v. FBL Fin. Servs., Inc., 129 S.Ct. 2343,

2351-52 (2009) (rejecting "mixed-motive" theory in the ADEA

---

　　　[4] The ADEA states in part that it is unlawful for an
employer "to fail or refuse to hire or to discharge any
individual or otherwise discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's age . . . ."  29 U.S.C.
§ 623(a)(1).

　　　[5] The PHRA provides in part that: "It shall be an
unlawful discriminatory practice . . . [f]or any employer because
of the . . . age . . . of any individual . . . to refuse to hire
or employ or contract with, or to bar or to discharge from
employment such individual . . . or to otherwise discriminate
against such individual . . . with respect to compensation, hire,
tenure, terms, conditions or privileges of employment or
contract, if the individual . . . is the best able and most
competent to perform the services required."  43 Pa. Cons. Stat.
Ann. § 955(a) (West).

context[6]); <u>Smith v. City of Allentown</u>, 589 F.3d 684, 691 (3d Cir. 2009) (in light of <u>Gross</u>, holding <u>McDonnell Douglas</u> still applies to ADEA claims); <u>Fasold v. Justice</u>, 409 F.3d 178, 183-84 (3d Cir. 2005) (ADEA and PHRA proceed under <u>McDonnell Douglas</u> framework). <u>Gross</u> teaches that "[t]o establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." 129 S.Ct. at 2350. The Supreme Court explained that this means "that age was the 'reason' that the employer decided to act." <u>Id.</u>

Under <u>McDonnell Douglas</u>, "an employee must first establish a prima facie case of discrimination, after which the burden [of production] shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." <u>Fasold</u>, 409 F.3d at 184. A plaintiff then bears the burden of production to show that the employer-defendant's proffered reasons for termination are, in fact, pretextual. <u>Smith</u>, 589 F.3d at 691. Our Court of Appeals has clarified that "[t]hroughout this burden-shifting exercise, the burden of

---

[6] Thus, under the ADEA it is improper to consider whether age was a "motivating factor." <u>See</u> <u>Gross</u>, 129 S.Ct. at 2350-51, n.3.

persuasion, including the burden of proving 'but for' causation

or causation in fact, remains on the employee." Id. (internal

quotation marks omitted).

In Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994),

Judge Becker's opinion for the panel explained that

> to defeat summary judgment when the defendant
> answers the plaintiff's prima facie case with
> legitimate, non-discriminatory reasons for
> its action, the plaintiff must point to some
> evidence, direct or circumstantial, from
> which a fact finder could reasonably either
> (1) disbelieve the employer's articulated
> legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more
> likely than not [the but-for] cause of the
> employer's action.

Accord Hodczak v. Latrobe Specialty Steel Co., No. 11-1085, 2011

WL 5592881, *2 (3d Cir. Nov. 17, 2011) (reflecting modification

to Fuentes and its progeny in light of Gross).  And "a plaintiff

who has made out a prima facie case may defeat a motion for

summary judgment by either (i) discrediting the proffered

reasons, either circumstantially or directly, or (ii) adducing

evidence, whether circumstantial or direct, that discrimination

was more likely than not [the but-for] cause of the adverse

employment action."  Id.

For our purposes here, we will assume that McGrath has

carried his step-one prima facie burden of production.  At step

10

two, LMC has proffered two legitimate, non-discriminatory reasons
for its decision to terminate plaintiff as part of the February
2008 RIF.  First, LMC contends that McGrath "did not possess the
seniority possessed by his peers -- in most cases, he had half
the seniority of his counterparts."  Def.'s Mot. Summ. J. 26-27.
Second, LMC avers that plaintiff "had issues that had been noted
throughout his employment -- i.e., he was abrupt, contentious,
intimidating, inappropriate, and was not a team player."  Id.

        With the burden then shifting back to McGrath, we
construe his arguments as contending that a reasonable jury could
disbelieve LMC's proffered reasons for McGrath's termination.  In
the alternative, we must consider whether a reasonable jury could
believe that an invidious discriminatory reason was more likely
than not the "but-for" cause of defendant's decision to terminate
McGrath.  Upon our consideration of the record taken as a whole,
McGrath simply does not carry his burden of production on the
question of pretext at McDonnell Douglas's third step for both
his ADEA and PHRA claims.

> ### A.   The "Disbelieve The
> ###      Proffered Reasons" Arguments

        Our Court of Appeals has explained that "[t]o show that
an employer's legitimate reasons should be disbelieved, a

plaintiff must offer evidence that would allow a fact finder to reasonably infer that 'each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action.'" Marione v. Metro. Life Ins. Co., 188 F. App'x 141, 144 (3d Cir. 2006) (quoting Fuentes, 32 F.3d at 764) (upholding district court's grant of summary judgment in RIF ADEA case where plaintiff failed to carry burden at third step).  To accomplish this pretext project, an employee-plaintiff must point to  "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable fact-finder could rationally find them unworthy of credence'".  Id. (quoting Fuentes, 32 F.3d at 764). Put another way, an employee-plaintiff must point to "'evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.'" Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (emphasis in original) (quoting Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005)).

In the face of LMC's two legitimate, non-discriminatory reasons for its decision to terminate McGrath, plaintiff has not pointed to any contradiction in the "core facts" that undergird LMC's proffered reasons.  It is undisputed that McGrath was the

12

least senior member in his department.  Def.'s Facts ¶¶ 38, 40;

Pl.'s Resp. Facts ¶¶ 38, 40.  It is also undisputed that

management repeatedly informed him that he lacked patience, could

be excessively judgmental, and was at times intimidating to

fellow traders.  Def.'s Facts ¶¶ 9-12, 22, 40; Pl.'s Resp. Facts

¶¶ 9-12, 22, 40.  The record is uncontroverted as to these "core

facts".  See also Raffetto Dep. 250:10-251:5.

     Though McGrath avers that "[a] jury could reasonably

conclude that [defendant] can justify any termination decision in

hindsight where its procedures require that something negative be

said in each review[,]" Pl.'s Facts ¶ 220, that generalization

has no record support here.  Even if we assumed LMC was obliged

to record "something negative" on each evaluation form,[7] the

inconvenient truth is that as far back as 2002 plaintiff knew

that his employer had concerns about his "curt and abrupt style

with both dealers and vendors."  Pl.'s Dep. at 44:1-20.  McGrath

also acknowledges that LMC's concerns carried over to subsequent

years and were shared with him through his last performance

---

[7] Though McGrath does not explicitly limit this
argument to the attitude-based reason for his termination, here
it must be so.  The "lack of seniority" reason is not a criticism
that appears in plaintiff's review, nor is it a "shortcoming"
that one would expect to find in such a review.  Rather, it was a
fact of LMC workplace life.

13

evaluation before his termination.  See, e.g., id. at 33-36.

Notably, McGrath himself does not disagree with these

descriptions.  Def.'s Facts ¶ 10 (citing Pl.'s Dep. 44:6-45:12);

Pl.'s Answer ¶ 10.  Consequently, no reasonable jury could find

that these justifications were conjured up post hoc as pretext

because they have been on the uncontroverted record for years.[8]

     In addition, McGrath contends that LMC proffers

"contradictory or implausible explanations" for its decision to

terminate him.  McGrath tries to make much out of inconsistencies

between what he contends LMC told the EEOC and what it now tells

us.  But plaintiff's own statement of facts betrays his argument.

McGrath concedes that "[defendant] said [in its EEOC response

---

     [8] Plaintiff contends that though "Raffetto says he
based the decision to cut [plaintiff] largely upon his seniority
and ability to work as a team member[,] . . . Raffetto's
testimony is contradicted in numerous of [sic] his evaluations of
[plaintiff].  [Pl.'s Facts ¶¶ 28-51]."  Pl.'s Resp. 3.  Two
sentences later, McGrath characterizes Raffetto's testimony as an
admission that he was lying.  Id.  First, McGrath points to no
evidence in the record to support his contention that "Raffetto .
. . testifie[d] that he lied, repeatedly."  Id.  Second, though
plaintiff's record citations focus on his success as a trader, it
is nevertheless undisputed that since his 2004 review to his last
review, McGrath was criticized as an impatient and excessively
judgmental person and a troublesome communicator.  Pl.'s Exs. 8-
11.  These undisputed core facts (and not plaintiff's success as
a trader, see Pl.'s Facts ¶¶ 28-51) go to whether defendant's
proffered legitimate, nondiscriminatory reasons constitute
pretexts for discrimination.

that] [plaintiff] was terminated based on 'seniority and overall
performance,' that he had the 'least seniority in the
department.'  It noted as an afterthought that [his] reviews were
'generally positive' but that he did have issues with fellow
traders who felt intimidated by him, and complained that he
lacked patience." Pl.'s Facts ¶ 102 (citing Pl. Ex. 72 ("Def.'s
EEOC Response")).  Thus, McGrath's own summary of LMC's EEOC
response reveals that the reasons the employer gave to the EEOC
for terminating him are the same as what it gives now.

### B.   The "Believe Invidious Discriminatory Animus" Arguments

        In addition to failing to discredit LMC's proffered
reasons, McGrath contends that he has pointed to three statements
that "evidence . . . bias against older employees" that could
cause a reasonable jury to believe that an invidious
discriminatory reason was more likely than not a motivating or
determinative cause of LMC's action.  Pl's Resp. 13; See Pl.'s
Facts ¶¶ 215-218, 221.  We disagree.[9]

_____

        [9]  In times too many to count, plaintiff's counsel
routinely misstates record evidence and mischaracterizes facts.
Compare Pl,'s Facts ¶ 24 ("Raffetto did not deny that McGrath was
told in a performance review meeting . . . that as part of the
evaluation process at LMC, managers were required to say
                                        (continued...)

---

[9](...continued)
something negative.") <u>with</u> Raffetto Dep. 147 (Q: Did you ever
tell Mike that you're required to think of something negative to
say about every buyer?  A: No.); <u>compare</u> Pl.'s Facts ¶ 42
("Raffetto was sure McGrath received an average or better
bonus.") <u>with</u> Raffetto Dep. 125:9-13 (Q: . . . [D]id he receive a
larger than average amount?  A: <u>I don't know.</u>  I'm assuming he
would have earned at least average or better." (emphasis added));
<u>compare</u> Pl.'s Facts ¶ 61 ("DiPietro's skills as a trader were so
lacking that Raffetto wanted to demote him to assistant buyer in
2007.") <u>with</u> Lefever Dep. 16-17:9-20 ("I was losing mills, going
out of business, and my territory was starting to get smaller. .
. . they came to me again and said they were going to . . .
demote one of my traders, Joe DiPietro . . . .  I didn't sleep at
all that night . . . what can I do to prevent my trader from
being demoted . . . they had said he wasn't performing up to par
compared to the rest of the floor.  So I did some research and
discovered that a couple of the traders . . . weren't performing
as well as my guy . . . .  I brought that to their attention and
convinced them to keep my buyer a buyer[.]").  <u>See also</u>
discussion in note twelve <u>infra</u>.

     Other paragraphs of plaintiff's statement of facts
contain illusory citations to the record.  <u>See, e.g.</u>, Pl.'s Facts
¶ 66 (discussing DiPietro's 2007 allegedly negative review but
actually citing to Thornton's 2007 review instead).  Still other
sections of plaintiff's response track language from plaintiff
Catherine Eno's response to a pending motion for summary judgment
before Judge Robreno in another case involving LMC.  <u>See</u> C.A. No.
10-7514, docket no. 18 therein, p. 4.  <u>Also see</u> Pl.'s Resp. 4
("He says his role in supervising this department was to be
disciplinarian so the managers on the floor would not have to,
and yet says he shied away from confrontation with <u>McGrath</u>. . . .
He says he tried to avoid confrontation but describes a meeting
in January 2008 with the entire department in which he was very
angry about having to work all weekend to fix certain computer
entries." (citations omitted) (emphasis added)).  This language
also appears in Eno's response to a motion for summary judgment,
although her name is substituted for McGrath's.  Curiously,
plaintiff retained a footnote in his response before us that
discussed Eno's case.  <u>See Id.</u> at 4 n.3.  Furthermore, McGrath
(continued...)

Our Court of Appeals has explained that for an employee-plaintiff "to show that discrimination was the likely cause of the adverse action, a plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to 'unlawful discriminatory treatment,' that it had 'treated other, similarly situated persons not of his protected class more favorably,' or that it had 'discriminated against other members of his protected class or other protected categories of persons.'" Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir. 2010) (quoting Fuentes, 32 F.3d at 765).

The first claimed evidence of bias is buried in paragraph 212 of plaintiff's recitation of facts, where he avers:

> DeCarlo testified that he include[d] the ages
> of [two] senior executives in their [2009]
> evaluations to the board because he saw them
> as a [sic] potential candidates to be his
> successor and, "[I wanted the board to have
> an understanding of where they were so that
> if the board] -- I mean if somebody were 62,
> with only three or four years to go as

---

[9](...continued)
points to no record evidence supporting the alleged January 2008 confrontation.
        In advancing these and other misstatements, plaintiff's counsel has crossed the line between zealous advocacy and the duty of candor she owes to the tribunal under Rule 3.3 of the Pennsylvania Rules of Professional Conduct and Fed. R. Civ. P. 11.

17

> president, they might say that's <u>not</u>[10] enough
> time." Decarlo Dep., Exh. "C" at 96, re: Plt.
> Exh. 25.

Pl.'s Facts ¶ 212 (footnote added); Pl.'s Ex. 25.  McGrath also

points to a statement made by one of LMC's agents about a

subsequently terminated thirty-five-year-old employee in which

the supervisor noted that he was "not sure about [the thirty-

five-year-old employee's] <u>long-term potential</u>; needs more direct

supervision." <u>Id.</u> ¶ 70 (emphasis added).  He also points to a

1991 list of employee names and ages DeCarlo crafted (as a lower-

level supervisor before he became CEO) as further evidence of

age-based discriminatory animus.  <u>Id.</u> ¶ 214.

But even giving the non-moving plaintiff the benefit of

any reasonable inferences drawn from these facts, they do not

even hint at discrimination <u>against</u> <u>McGrath</u> here, and:

> a rational jury could not say [the facts of
> record] are sufficient to show, by a
> preponderance of the evidence, that
> discrimination was more likely than not . . .
> the [but-for] cause of [defendant's] actions.
> Nor do they suffice to discredit the
> nondiscriminatory reasons proffered by
> [defendant] by demonstrating such weaknesses
> in those reasons that a reasonable juror
> could rationally find them unworthy of
> credence[,]

---

[10] Significantly, McGrath's citation to this record
omits this crucial word.

Anderson, 621 F.3d at 279 (internal quotation marks and citations omitted).

First, DeCarlo's 2009 statement post-dates McGrath's termination.  It is merely evidence that he provided a different set of decisionmakers (the board) with one man's age, with no pejorative intimation.  Moreover, DeCarlo only identifies the man's age and date of birth after noting his thirty-two-year tenure with the firm.  Pl.'s Ex. 25 ("John completed 32 years with LMC on June 1, 2008 having started as a roofing buyer in 1976. . . . John turned 60 on February 5, 2008").[11]  This statement, however, is unaccompanied by any reference to record evidence tying it to any of the board's employment decisions.  More importantly, McGrath points to no evidence linking this 2009 statement to LMC's 2008 decision to terminate him.  At bottom, this 2009 statement is of no probative value to a reasonable jury's deliberation on the question of whether LMC terminated McGrath because of his age.  See Hodczak, 2011 WL 5592881, at *3 (agreeing with district court that statements that were

_____

[11] On the record here, the post-termination reference to John's thirty-two-years with the firm suggests nothing of age-based discriminatory animus.  See Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993) ("When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears.").

temporally removed and about different subject matter were stray
remarks entitled to little weight and thus insufficient to carry
burden of production at third step).

Second, with nothing more, the evaluation of a thirty-
five-year-old employee that expresses doubt about that employee's
"long-term potential" at the company fails to show that this
employee was treated more favorably than McGrath (in fact, this
younger employee was terminated in the second RIF a few months
later, undermining this contention, Def.'s Facts ¶¶ 63-65; Pl.'s
Facts ¶ 73), was a member of some other protected category, or
that the "long-term potential" remark had any nexus to the
employee's age or -- central to our inquiry here -- LMC's
decision to terminate McGrath supposedly because of his age.

Third, the 1991 list of employee names and ages, even
if composed during another RIF year, is unaccompanied by any
reference to record evidence showing that this by-then seventeen-
year-old list guided any defendant-made age-based employment
decision as to plaintiff or (for that matter) any other
contemporary employee.  Nor does it have probative value given
its antiquity relative to McGrath's termination.  See Reich v.
Schering Plough Corp., 399 F. App'x 762, 765 (3d Cir. 2010)
(internal quotation marks omitted) (agreeing with district court

20

that four and five year old "throw-away remarks were too removed
in time and too de minimis to constitute direct or indirect
evidence of age-based animus" so as to survive summary judgment
(internal quotation marks and alterations in original omitted)).
Moreover, McGrath points to no evidence suggesting that his name,
age, or birthdate appeared on that seventeen year old list.

It is also important to note that McGrath admits that
none of LMC's agents ever made any reference to his age at the
time of his termination.  Pl.'s Dep. 57:8-12.  At bottom, he
merely surmises: "what other reason could there have been" for
his termination but his age?  Id. 57:23-24.  Such a rhetorical
question on this record will not trigger ADEA or PHRA
liability.[12]

_____

[12] Along a similar line of reasoning,

Plaintiff submits that there is
sufficient evidence for a jury to
conclude that Toombs, who is
quarterbacking LMC's response,
exhibited the same bias toward
older employees as DeCarlo
articulated, and then convinced his
older subordinate to "fall on his
sword" and take responsibility for
the decisions, and that the
inconsistencies in their stories
are the inevitable "tangled web we
weave, when first we practice to

(continued...)

21

---

[12] (...continued)

deceive."

Pl.'s Resp. 4 (emphasis added).  We agree with LMC that "[n]ot
only is there not sufficient evidence to support this fantastic
theory, there is no evidence.  There is nothing to show that
Toombs, Raffetto, DeCarlo or anyone else at [LMC] had some type
of bias towards older workers."  Def.'s Reply 8.  McGrath points
to no evidence that Toombs convinced any subordinate to take
responsibility for any decision here.

Furthermore, plaintiff's claim that Toombs
"quarterbacked" defendant's response and took steps "to be sure
everyone told the same story[,]" Pl.'s Facts ¶¶ 136, 139, are
misleading.  In support of this claim, McGrath contends that
Toombs had "back and forth discussions with Raffetto to 'get the
facts straight[,]'" Id. ¶¶ 136, 137, and "remind[ed] [defendant's
witnesses] what had happened, . . . [by] providing a 'refresher
course . . . just walk[ed them] through the process just to
remind them how the process had worked[,]'" id. ¶ 138.  First,
McGrath fails to point to the line immediately preceding this
discussion in Toombs's deposition testimony: "Q: Did you discuss
with them the strategy or response that [defendant] had adopted
in this case?  A: No."  Toombs Dep. 35:8-11 (emphasis added).
Plaintiff's own record citation points to no evidence that Toombs
ever discussed the facts of this case with any of the deponents.
Second, the "get the facts straight" remark was taken from
deposition testimony about Catherine Eno's claim, not McGrath's
claim.  Id. 80-84 (discussing defendant's response to Eno's EEOC
complaint).  Thus, this remark has no relevance to the matter
here.  See also Pl.'s Facts ¶ 140.

Regarding any subordinate-bias or "cat's paw" theory of
discrimination, McGrath cites no record evidence suggesting that
any of defendant's employees acted with age-based discriminatory
animus.  See Marcus v. PQ Corp., Nos. 11-2009, 11-2066, 2012 WL
149802, *2 n.3 (3d Cir. Jan. 19, 2012) (internal quotation marks
omitted) ("A 'cat's paw' or 'subordinate bias' theory of
liability is one in which the plaintiff seeks to hold his
employer liable for the animus of a nondecisionmaker.").
Consequently, since there is no evidence that any LMC employees
harbored a discriminatory animus, McGrath's "direct

(continued...)

22

## The "Highly Successful In His Position" Argument

Under the heading entitled, "McGrath was highly successful in his position," plaintiff contends that he received nondiscretionary and discretionary bonuses and a promotion during his employment with LMC.  Pl.'s Facts ¶¶ 42-46.  This bonus and promotion evidence is inadequate to survive summary judgment here, even in light of our Court of Appeals's teachings in Tomasso and Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1073-74 (3d Cir. 1996) (en banc) (arising under Title VII in a non-RIF context where the district court granted post-trial judgment as a matter of law against the verdict winner plaintiff despite denying summary judgment on same claim), that an "employee could show pretext in part by adducing affirmative evidence of her own accomplishments, including awards, a promotion, and a salary increase."  445 F.3d at 709 (emphasis added and internal quotation marks omitted).

Our Court of Appeals's reasoning acknowledges that this species of evidence alone will not suffice to establish a plaintiff's burden of production on the question of pretext at

---

[12] (...continued)
discriminatory animus" argument must fail whether asserted against decisionmakers or nondecisiomakers.

step three.  Id. at 708-09 (after noting that plaintiff's
evidence contradicted core facts, the Court observed that "[t]o
be sure, [plaintiff] discredits [defendant's] rationale in part
by pointing to external evidence[.]" (emphasis added)); Sheridan,
100 F.3d at 1074 ("In addition to the affirmative evidence of her
own accomplishments" evidence was presented "directed to
impeaching the credibility of [defendant's] witnesses" whose
testimony was at the core of defendant's proffered legitimate,
non-discriminatory reasons (emphasis added)).  Thus, our Court of
Appeals's reasoning elicits the question: in addition to the
positive employment history, what comprises the rest of the
evidentiary whole necessary to carry the burden of production on
the threshold question of pretext under this theory?[13]

---

[13]  We are not interpreting our Court of Appeals as
adopting a "pretext-plus" approach at the third step.  It is
well-settled that our Court of Appeals has expressly rejected
such a showing.  Instead, we read our Court of Appeals's teaching
in Sheridan and Tomasso to hold that the evidence required to
make the threshold showing of pretext requires evidence of a
favorable employment history along with some other pretext-
suggestive evidence.  In other words, though no direct showing of
discriminatory animus is required, displaying a favorable
employment history plus the prima facie case will not get the
plaintiff to the jury on the third step.  This method of
establishing pretext is in contrast, of course, to a situation
where the employee points to evidence that contradicts the core
foundational facts upon which an employer bases its proffered
legitimate, nondiscriminatory reason.

The need for <u>some</u> additional evidence beyond a positive employment history is especially warranted in the RIF context. <u>See</u> <u>Tomasso</u>, 445 F.3d at 710 n.9.  Our Court of Appeals has explained that "[i]n a RIF, a company is often forced to terminate the worst of the best, <u>i.e.</u>, an adequate or even high-performing employee who is under-performing relative to his peers."  <u>Id.</u> at 711 (Roth, J., dissenting); <u>id.</u> at 710 n.9 (majority opinion adopting this reasoning); <u>accord</u> <u>Marione v. Metro. Life. Ins. Co.</u>, 188 F. App'x 141, 144 (3d Cir. 2006) ("We recognize that in a RIF, a company is often forced to terminate 'the worst of the best,' and therefore an adequate employee who is under-performing relative to his peers may still be chosen for termination.").  Judge Roth's opinion in <u>Tomasso</u> persuasively reasons that in analyzing an employer's disputed RIF decision, "subjective categories such as 'attitude' and 'teamwork' need to be viewed . . . in light of the fact that employers must distinguish otherwise competent employees" and thus "the margin of distinction between terminated and retained employees often shrinks."  <u>Tomasso</u>, 445 F.3d at 711-12 (Roth, J., dissenting). This unfortunate but realistic aspect of RIFs suggests that "the

employer's margin of appreciation to make a good faith mistake .
. . must be respected" here.   Id.[14]

Moreover, even outside of RIF contexts, our Court of
Appeals has explained that a "plaintiff cannot simply show that
the employer's decision was wrong or mistaken, since the factual
dispute at issue is whether discriminatory animus motivated the
employer, not whether the employer is wise, shrewd, prudent or
competent."   Fuentes, 32 F.3d at 765.

The particulars of Sheridan and Tomasso explicate this
point.  In Sheridan, our Court of Appeals (in paragraphs spanning
two pages of the Federal Reporter) painstakingly documented the
employee's history of steady promotions and professional
accolades that led right up until the time she lodged her
complaint of sex discrimination.  100 F.3d at 1072-73 (listing

---

[14] It is important to stress that the majority's
opinion in Tomasso does not quibble with Judge Roth's reasoning
on this point.  To the contrary, Judge Becker's opinion "agree[s]
with the dissent that a decision to lay off an employee in a RIF
differs from a decision to fire an employee during ordinary
circumstances."  445 F.3d at 707; see id. at 710 n.9 ("[W]e agree
with the dissent that the RIF provides context important to the
layoff.").  The majority opinion notes that "our disagreement
with the dissent has nothing to do with an abstract debate about
the role of context and everything to do with the facts of this
case."  Id.  Thus, we cite Judge Roth's persuasive dissenting
opinion to highlight the uncontroversial RIF-context-specific-
inquiry that is decisive here.

professional accomplishments).  The Court observed that record evidence showed that her employer "attempted to paint a different picture" of the employee's work performance only <u>after</u> Sheridan accused her employer of sex discrimination "[n]otwithstanding the record evidence of promotions and commendations".  <u>Id.</u> at 1073. Thus, the employer's abrupt about-face supplied the additional evidence needed to supplement the consistent positive employment history to show pretext.  This evidentiary reality led the Court to uphold the jury's verdict and reverse the district court's post-trial judgment as a matter of law.  <u>Sheridan</u> relied heavily on <u>Fuentes</u> and our Court of Appeals justified its decision by stressing that the record was "clear that the jury . . . was faced with evidence on both sides of the issues raised by the parties."  <u>Id.</u> at 1075.

In <u>Tomasso</u>, though our Court of Appeals found pretext on other grounds, it remarked (but did not hold on the facts of the case) that external evidence of satisfactory work performance could be adequate to show pretext.  445 F.3d at 708-09. Nevertheless, in suggesting that such "external evidence" may be enough to satisfy a plaintiff's step three burden of production, the Court compared differences in the employee's favorable performance reviews and an evaluation of his participation in a

27

certain project at a time near his termination with the
employer's termination-determinative evaluation form.  For the
first time, that form showed a lack of satisfaction with these
same areas.  445 F.3d at 708-09.  Again, such reasoning suggests
that some cognate of about-face-like evidence against a record of
positive work performance is needed to show pretext that will
survive summary judgment.

     In sum, our Court of Appeals's jurisprudence holds that
a plaintiff's bonus and promotion evidence alone will not suffice
to carry the step three burden of production -- particularly in a
RIF context.  McGrath's argument on this ground fails because he
points to no other evidence to support a threshold showing of
pretext.  The uncontroverted record evidence reveals that at the
time of his termination McGrath was the least senior employee in
his department and his evaluations had, for years, reflected his
curt, abrupt, and intimidating work style.  Even though he
received a non-discretionary bonus[15] and at least one promotion
during his tenure, McGrath's performance reviews continued to

---

     [15]  McGrath only points to evidence of a non-
discretionary bonus paid for work done about four years prior to
his termination.  Notably, in the year that LMC paid this
discretionary bonus, all of plaintiff's departmental colleagues
received a bonus.  Id. at 127:25-129:14.

reflect LMC's concern for, and criticism of, his attitude up through his final review before termination.  Since McGrath fails to point to any evidence beyond his one-time discretionary bonus and promotion history, he has not met the step three burden of production on the pretext question.  In short, on this record there is only one side to the story.

In light of our consideration of the record taken as a whole, McGrath's ADEA and PHRA claims must succumb to summary judgment.


BY THE COURT:


\_\_\s\Stewart Dalzell